UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Alexander Bourque

          v.                          Civil No. 17-cv-268-LM
                                      Opinion No. 2018 DNH 149
Nancy A. Berryhill, Acting
Commissioner of Social Security


**O R D E R**

     Alexander Bourque seeks judicial review, pursuant to 42
U.S.C. §§ 405(g) & 1383(c)(3), of the decision of the Acting
Commissioner of the Social Security Administration, denying his
application for disability insurance and Supplemental Security
Income benefits.  Bourque moves to reverse the Acting
Commissioner's decision, and the Acting Commissioner moves to
affirm.  For the reasons discussed below, the decision of the
Acting Commissioner is affirmed.


**STANDARD OF REVIEW**

     In reviewing the final decision of the Acting Commissioner
in a social security case, the court "is limited to determining
whether the ALJ deployed the proper legal standards and found
facts upon the proper quantum of evidence."  Nguyen v. Chater,
172 F.3d 31, 35 (1st Cir. 1999); accord Seavey v. Barnhart, 276
F.3d 1, 9 (1st Cir. 2001).  The court defers to the ALJ's
factual findings as long as they are supported by substantial

evidence.  42 U.S.C. § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016).  "Substantial evidence is more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Astralis Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010).

In determining whether a claimant is disabled, the ALJ follows a five-step sequential analysis.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[1]  The claimant "has the burden of production and proof at the first four steps of the process." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  The first three steps are (1) determining whether the claimant is engaged in substantial gainful activity; (2) determining whether he has a severe impairment; and (3) determining whether the impairment meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).

At the fourth step of the sequential analysis, the ALJ assesses the claimant's residual functional capacity ("RFC"), which is a determination of the most a person can do in a work setting despite his limitations caused by impairments, id.

---

[1] Because the pertinent regulations governing disability insurance benefits under 20 C.F.R. Part 404 are the same as the pertinent regulations governing Supplemental Security Income benefits under 20 C.F.R. Part 416, the court will cite only Part 404 regulations. See Reagan v. Sec'y of Health & Human Servs., 877 F.2d 123, 124 (1st Cir. 1989).

§ 404.1545(a)(1), and his past relevant work, id.
§ 404.1520(a)(4)(iv).  If the claimant can perform his past
relevant work, the ALJ will find that the claimant is not
disabled.  See id. § 404.1520(a)(4)(iv).  If the claimant cannot
perform his past relevant work, the ALJ proceeds to Step Five,
in which the ALJ has the burden of showing that jobs exist in
the economy which the claimant can do in light of the RFC
assessment.  See id. § 404.1520(a)(4)(v).

## BACKGROUND[2]

On November 7, 2014, Bourque filed an application for
disability insurance and Supplemental Security Income ("SSI")
benefits.  He alleged impairments of back problems, lung
problems, and Post-Traumatic Stress Disorder.  He initially
alleged an onset date of February 28, 2011, but he later amended
it to November 23, 2014.  Bourque was forty-four years old in
November 2014.  He has a limited education, having failed to
complete eighth grade, and his past relevant work includes a
boiler house mechanic, fuel house attendant, and salvage
laborer.

---

[2] A detailed statement of the facts can be found in the
parties' Joint Statement of Material Facts (doc. no. 14).

I. <u>Medical Record</u>

Proceeding chronologically, the court summarizes the relevant evidence in the record. On July 15, 2010, Bourque received an MRI, the results of which showed degenerative disc disease.

In mid-November 2014, Bourque allegedly injured his lower back while lifting an appliance. A few days later, on November 25, 2014, Bourque visited an emergency room, complaining of lower back pain that radiated down his left leg to above the knee. On examination, Bourque's reflexes and strength were normal, but he had a limited range of motion due to the back pain. Bourque had left sciatic notch discomfort on palpation and a positive leg raise test. Bourque received Toradol, which dulled the pain.

On December 12, 2014, Bourque again visited the emergency room, complaining of back pain that radiated down his left leg. The treating physician observed that Bourque walked with a "little bit of antalgic gait," that he was in no distress, and that he exhibited discomfort in his lumbosacral junction on the left and tenderness on the left sacral notch. Bourque exhibited normal strength, normal reflexes, and had a negative straight leg raise test.

Two days later, Bourque returned to the emergency room, complaining of lower back pain radiating down his left leg.

Bourque stated that he had not obtained any relief from the pain medication he received at the previous visit. Bourque exhibited tenderness in the lumbosacral region and in the left SI joint, which had decreased range of motion. Bourque stated that he had problems sitting because of the pain. Bourque exhibited normal strength with no muscle wasting.

On January 9, 2015, Bourque visited Amanda Dustin, APRN, his primary care provider. Dustin observed that Bourque appeared distressed, sat in his chair sideways and hunched over, and readjusted his position continually. Bourque exhibited reduced mobility in his back, flank tenderness, and he was unable to flex, extend, bend, or rotate his trunk. Bourque exhibited normal station and gait, and Dustin noted intact motor and sensation. Dustin prescribed Bourque new medications. But Bourque returned to Dustin a few days later, stating that his back pain remained unchanged and that the pain woke him up at night. Bourque noted that he was only able to assist his brother-in-law build a gate for thirty minutes because the activity aggravated his back pain. Bourque stated that one of his medications, trazodone, "made him shaky" and so he stopped taking it. Admin. Rec. at 476. Bourque did note that one of the other medications, prednisore, helped "for as long as he is on it." Id. Dustin observed that Bourque was in no acute distress, though Bourque had limited range of motion in his

spine.  Dustin noted intact motor and sensation, with normal
station and gait.  Dustin observed that Bourque was slow to get
up.

On January 22, 2015, Bourque visited Dr. Jay Solorio, M.D.,
who worked at an orthopedic clinic.  Complaining of low back and
left-leg pain, Bourque told Dr. Solorio of the November 2014
incident, in which he began experiencing pain after lifting an
appliance.  Bourque reported that it was painful to rise from a
chair and drive, that the pain was worse in mornings and
evenings, and that the pain was getting progressively worse.
Dr. Solorio examined Bourque, noting a muscular spasm in the
lumbar spine and tenderness in the lumbar spine and left sciatic
notch.  A straight leg raise test was positive on the left and
negative on the right.  Bourque exhibited diminished sensation
in his left toes and plantar foot, but normal muscle strength
and tone.  Dr. Solorio ordered an MRI.

On January 30, before Bourque obtained a second MRI, Dr.
Peter Loeser, M.D., conducted a consultative examination.  Dr.
Loeser observed that Bourque looked well-nourished and well-
developed, and was in no apparent distress.  Bourque had grossly
normal alignment, curvature, and range of motion in the lumbar
spine, except that he had a mildly decreased range of motion in
all directions because of pain.  Dr. Loeser indicated no
tenderness, muscle spasms, or atrophy in the area.  The supine

straight leg raise was intact, but Bourque showed pain in the lower back at the extreme range in his right leg. Overall, Dr. Loeser found the lumbar spine examination to be "unremarkable" without "tenderness to palpation." Admin. Rec. at 444. Bourque did exhibit a mild decrease in fine-touch sensation in his left lower extremities, but he showed a normal ability to sit and stand, step up and down, get on and off the examination table, and remove and put on socks. On the other hand, Bourque had a severe limp in his left leg from pain, and, as a result, was unable to walk on his left toe or heel, or perform more than a shallow squat.

As is relevant here, Dr. Loeser diagnosed Bourque with low back pain of uncertain etiology with left leg radiculopathy, and stated that "these symptoms might improve with further evaluation and management, possibly involving physical therapy and/or localized treatments." Id.

On February 5, 2015, Bourque received the second MRI of his spine, which showed degenerative changes in the lumbar spine.

On February 14, 2015, Dr. Trina Jackson, Psy. D, conducted a psychological consultative examination. Bourque reported that he completed seventh grade, after which he dropped out due in part to his learning difficulties. Dr. Jackson noted that Bourque had intact short- and long-term memory, with no difficulty in concentration. Based on a few tests that she

conducted, Dr. Jackson estimated that Bourque's intellectual
functioning was in the low-average to below-average range.
Based on this examination, Dr. Jackson concluded that Bourque
was able to remember and manage activities of daily living, as
well as act appropriately and effectively in the social
functioning domain.  Dr. Jackson highlighted one functional
capacity of concern: Bourque's ability to understand and
remember.  She opined that, while Bourque demonstrated no
serious difficulties in memory, his cognitive abilities, "which
may be below average," may make it more difficult for Bourque to
complete complex tasks.  Admin Rec. at 450.  Dr. Jackson stated
that Bourque "is able to function appropriately and effectively
in this domain, but will need accommodations and may have
difficulty with consistency due to possible cognitive
difficulties."  Id.  Dr. Jackson diagnosed Bourque with mild
alcohol use disorder (in full remission), and "Possible
Borderline Intellectual Functioning."  Id.  She recommended that
Bourque "may benefit from intellectual testing to determine his
level of cognitive functioning."  Id. at 451.

On February 16, Bourque met with APRN Dustin.  Bourque
continued to complain of back pain and radiculopathy.  Dustin
noted that Bourque had reduced mobility in his spine and found
it painful to stand.  Bourque's straight leg raise was positive,

but he had intact sensation and motor, and normal station and gait.

On February 24, Dr. Edward Martin, a non-examining agency consultant, completed a psychiatric evaluation for purposes of the initial review of Bourque's application. Dr. Martin gave Dr. Jackson's opinion great weight. He construed her opinion as diagnosing Bourque with no psychiatric diagnosis except an alcohol use disorder, for which Bourque was in full remission. Based on the absence of any other diagnosis, Dr. Martin concluded that Bourque had no medically determinable mental impairments.

On February 25, Bourque had a second visit with Dr. Solorio. Bourque complained of back and left leg pain. Dr. Solorio noticed tenderness in Bourque's lower lumbar spine and left sciatic notch, and Bourque's straight leg raise test was positive on the left. Dr. Solorio noted that Bourque's eversion strength was grade 5- over 5, and otherwise normal in both legs. Dr. Solorio provided Bourque with a one-time prescription for Lortab, discharged Bourque from his care, and instructed Bourque to follow up with Dr. Thomas Kleeman, a neurosurgeon.

On March 5, Dr. Hugh Fairley, a non-examining agency consultant and medical doctor, completed an RFC assessment on initial review of Bourque's application. Dr. Fairley opined that Bourque could lift 20 pounds occasionally and 10 pounds

frequently, could sit for about six hours in a workday, and could stand or walk for about six hours in a workday. Dr. Fairley opined that Bourque was limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs, but should never climb ladders, ropes, or scaffolds.

Bourque met with Dr. Kleeman on March 9. Bourque told Dr. Kleeman that he had constant leg symptoms on the left, which was aggravated by all positions and relieved by laying down with a pillow under the knees. Bourque estimated that his pain was, on a ten-point scale, usually a seven or eight, at worst a ten, and at least a five. Dr. Kleeman examined Bourque, finding that Bourque had equal and symmetric reflexes, a negative straight leg raise test, with a normal motor exam and intact sensation. Dr. Kleeman opined that "neurologically [Bourque] is still intact," which created "no urgency" for surgery. Id. at 586.

In July 2015, Bourque met with Dr. Robert Soucy, D.O., while Bourque was incarcerated at the Coös County House of Corrections. Bourque reported back complaints and rising anxiety, for which Dr. Soucy prescribed him Klonopin and Celexa.

The next year, on March 1, 2016, Dr. Soucy provided a letter to Bourque's counsel regarding Bourque's RFC. Dr. Soucy stated that Bourque worked while incarcerated, "doing night crew which involved lifting buckets, mopping floors and lifting

buffing machines." Id. at 498. Dr. Soucy opined that, for the period that he knew him, Bourque could perform sedentary work.

Also on March 1, 2016, Dr. Solorio completed a medical source statement for Bourque. He diagnosed Bourque with a herniated nucleus pulposus at L5-S1, and degenerative disc disease at L2-L3 and L5-S1. These resulted in symptoms of back and left leg pain, as well as numbness in the left foot. Dr. Solorio stated that the pain in the back and left leg occurred frequently day and night, and estimated that the pain was an "8/10." Id. at 579. Dr. Solorio opined that Bourque's symptoms would frequently interfere with his attention and concentration in performing simple work tasks.

Dr. Solorio stated that Bourque could only sit for one hour at a time or two hours total in a workday. Bourque could only stand for one hour at a time or stand and walk for two hours total in a workday. Bourque would need breaks to walk, would need to be able to shift at will from sitting, standing, or walking, and would need an hour break every day. Bourque could occasionally lift ten pounds and could never lift twenty pounds or more. Dr. Solorio stated that Bourque should never twist, stoop, or climb ladders, could only rarely crouch or squat, and could occasionally climb stairs. Dr. Solorio opined that Bourque would have good and bad days that would cause him to be absent more than four day per month.

On March 15, Dr. Andrew Forrest, M.D., examined Bourque for low back and left leg pain. Dr. Forrest observed that Bourque was in no acute distress, had normal station but an antalgic gait on the left. Bourque exhibited decreased range of motion in the spine, normal motor strength, normal tone and muscle bulk in both legs, and normal sensation. Dr. Forrest prescribed Bourque gabapentin.

## II. Hearing Testimony

Bourque's application was denied on initial review, after which he sought a hearing before an ALJ. The hearing was held on March 16, 2016. Bourque, who was represented by counsel, appeared and testified at the hearing, as did Christine Spaulding, a vocational expert.

Bourque testified that he lived with his girlfriend, who is physically and mentally disabled. Bourque stated that his girlfriend would typically do the household chores, except that he would wash dishes or sweep occasionally. Bourque's girlfriend would assist him with getting out of the shower, because of weakness in his legs, and would help him tie his sneakers. Bourque testified that he dropped out of school before completing eighth grade, which he had repeated three times. While in school, Bourque was enrolled in special education classes.

Bourque stated that his medical conditions were leg numbness and back pain, which caused various functional limitations. He could not shovel snow, he could grocery shop for only ten minutes, he could sit for no more than two hours and stand for no more than two hours per eight-hour workday. He also needed to lay down for four to five hours per day. Bourque believed that he could occasionally lift ten pounds or less.

Bourque testified that, while incarcerated, he lifted buckets and mopped floors. He performed these tasks three times in two months. He stated that he visited with Dr. Soucy three times while he was incarcerated, but that Dr. Soucy never examined him.

III. ALJ's Decision

The ALJ issued his decision on May 18, 2016. At step one, the ALJ found that Bourque had not engaged in substantial gainful activity since November 2014. At step two, the ALJ determined that Bourque had a severe impairment of degenerative disc disease. At step three, the ALJ determined that Bourque's impairment did not met a listed impairment. At step four, the ALJ concluded that Bourque can perform a limited range of light work, in that he could occasionally climb ramps and stairs, could never climb ladders, ropes, or scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl. Although

the ALJ found that Bourque cannot perform any past relevant work given this RFC assessment, he concluded at step five that there are significant numbers of jobs in the national economy that Bourque could perform.  Therefore, the ALJ found that Bourque is not disabled with the meaning of the Social Security Act.  The Appeals Council denied Bourque's request for review, making the ALJ's decision the Acting Commissioner's final decision.

## DISCUSSION

Bourque raises three broad claims of error on appeal.  He argues that the ALJ erred in (1) weighing the medical opinions in the record, (2) evaluating Bourque's subjective complaints and symptoms, and (3) failing to order further intellectual testing.  The court addresses each argument below.

## I. Medical Opinions

Bourque first contends that the ALJ erred in weighing the medical opinions in the record.  Specifically, Bourque argues that the ALJ erroneously gave little weight to Dr. Solorio and only partial weight to Dr. Soucy.  Conversely, Bourque faults the ALJ for giving great weight to the opinions of Drs. Loeser and Fairley.

"An ALJ is required to consider opinions along with all other relevant evidence in a claimant's record."  Ledoux v. Acting Comm'r, Social Sec. Admin., No. 17-cv-707-JD, 2018 WL

2932732, at *4 (D.N.H. June 12, 2018). The ALJ analyzes the opinions of state agency consultants, treating sources, and examining sources under the same rubric. See id.; 20 C.F.R. § 404.1527(c). The ALJ must consider "the examining relationship, treatment relationship (including length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship), supportability of the opinion by evidence in the record, consistency with the medical opinions of other physicians," along with the doctor's expertise in the area and any other relevant factors. Johnson v. Berryhill, No. 16-cv-375-PB, 2017 WL 4564727, at *5 (D.N.H. Oct. 12, 2017).

However, an ALJ must give the opinion of a treating source "controlling weight" if the opinion "is well-supported and consistent with substantial evidence." Stafford v. Berryhill, No. 17-cv-345-LM, 2018 WL 3029052, at *3 (D.N.H. June 18, 2018). "[I]f the ALJ rejects the opinion of a treating source, the ALJ must give good reasons for his determination, which must be both specific and supportable." Id.

Before delving into the medical opinions, it will be helpful to briefly describe the ALJ's overall reasoning. The ALJ appears to have placed heavy reliance on two inferences from the medical evidence and examination findings. First, Bourque generally exhibited normal leg strength and ambulation, from

which the ALJ concluded that Bourque could perform light work and did not need to, as Bourque asserted, "lie down 4 to 5 hours per day." Admin. Rec. at 19. Second, the ALJ noted that Bourque's straight leg raise tests had been positive on some occasions and negative on others. Similarly, Bourque sometimes exhibited a "mild decrease in fine touch" in his left leg, while at other times his "sensation remained intact." Admin. Rec. at 19. The ALJ inferred from these variances that Bourque only had "occasional radicular symptoms," which did not generally prevent him from performing light work. Admin. Rec. at 20. Nevertheless, in conjunction with Bourque's decreased range of motion and tenderness in the lumbar spine, these radicular symptoms justified some additional exertional limitations, which the ALJ incorporated into Bourque's RFC. Furthermore, the ALJ emphasized that "relatively stable" treatment regimens had been recommended to Bourque over the years, usually consisting of medication. Physical therapy and surgical options had been suggested by various professionals, but Dr. Kleeman indicated that surgery was not urgent. The ALJ's reading of the record is consistent with and supported by Dr. Fairley's RFC assessment, whose opinion the ALJ gave great weight. Dr. Fairley opined that Bourque could perform light work with some exertional limitations.

The court now turns to Bourque's arguments.

a. Dr. Solorio

Bourque contends that the ALJ erroneously gave little weight to the opinion of Dr. Solorio, raising three arguments.

First, Bourque contends that the ALJ overstated the effect of medication on Bourque's symptoms between his first and second examinations with Dr. Solorio.  In affording Dr. Solorio's opinion little weight, the ALJ noted that Dr. Solorio's clinical findings are inconsistent with his assessment that Bourque is unable to work.  See Cruz v. Astrue, No. 11-638M, 2013 WL 795063, at *15 (D.R.I. Feb. 12, 2013) (stating that an ALJ may disregard a treating physician's opinion where it is inconsistent with his treatment notes).  In his assessment, Dr. Solorio characterized Bourque's back and left-leg pain as occurring frequently during the day and night.  But the ALJ cites contrary evidence from Dr. Solorio's examination notes.  Specifically, at the time of his first examination, Bourque "experienced muscle spasms, tenderness, diminished sensation in the left foot, and a positive straight leg raise on the left." Admin. Rec. at 21.  Bourque did maintain normal leg strength, however.  Bourque was then prescribed medication, and "[w]ith treatment, there was no spasm on Dr. Solorio's second exam and [Bourque] maintained full strength."  Id.

Bourque argues that the ALJ's reliance on the effect of medication was faulty, citing other evidence in the record to show that Bourque's condition did not significantly change by the second examination. Bourque notes that, at the second examination, Dr. Solorio referred Bourque to Dr. Kleeman for surgical evaluation and reported that there had been "no interval change [in Bourque's] condition" and Bourque "continued [to] have back and left leg pain chronically." Admin. Rec. at 467.

But, as the court reads the decision, the ALJ's point about the quick alleviation of Bourque's muscle spasms between examinations was not a broad assertion that Bourque's symptoms were fully ameliorated with treatment. Rather, the ALJ's point was that, contrary to Dr. Solorio's assessment, Bourque's radicular symptoms are more intermittent than frequent, and the fact that Bourque's muscle spasms faded is one piece of evidence in support of that conclusion. The court finds the ALJ's inference reasonable, and the mere identification of other evidence that could support a contrary inference is insufficient to undermine the ALJ's decision. See Beaune v. Colvin, No. 14-cv-174-PB, 2015 WL 4205251, at *1 (D.N.H. July 10, 2015) (stating that it is "the role of the ALJ . . . to resolve conflicts in the evidence").

Second, Bourque asserts that the ALJ misstated the evidence when he gave less weight to Dr. Solorio's opinion on the ground that "the longitudinal history shows a lack of radicular symptoms as [Bourque's] straight leg raise has been negative." Admin. Rec. at 21.  See Jessica B. v. Berryhill, No. 17-cv-294-NT, 2018 WL 2552162, at *5 (D. Me. June 3, 2018) (noting that inconsistency with record as a whole can provide good reasons for according the opinion of a treating source little weight); 20 C.F.R. § 404.1527(c)(4).  Bourque argues that the ALJ misstated the evidence because, in fact, Bourque had positive straight leg raise tests for his left leg at both of Dr. Solorio's examinations.

Understood in context, the ALJ's remark was not a misstatement of the evidence.  Indeed, the ALJ acknowledged in his decision that, like many of his symptoms and examination findings, Bourque had both positive and negative straight leg raise tests in his medical record.  See Admin. Rec. at 19.  For that reason, the court does not read the ALJ to be claiming that Bourque never had a positive straight leg raise test.  Instead, the ALJ infers that Bourque does not have constant radicular symptoms, the evidence for which includes Bourque's negative straight leg raise tests at some examinations.  The court does not consider that to be an impermissible inference from the

record, and it is an inference that undermines one premise of Dr. Solorio's opinion—namely, that Bourque has frequent back and left-leg pain.

Third, Bourque argues that the ALJ erred by failing to acknowledge Dr. Solorio as a treating source and by failing to address all relevant factors in 20 C.F.R. § 404.1527(c). The court disagrees. Assuming that Dr. Solorio can be considered a treating source, the ALJ provided good reasons for affording his opinion little weight. As noted above, the ALJ found Dr. Solorio's assessment inconsistent with his own clinical findings and with the objective medical evidence. In addition, the ALJ noted that Dr. Solorio only examined Bourque on two occasions. See Comeau v. Colvin, No. 12-cv-478-JL, 2013 WL 5934308, at *7 (D.N.H. Nov. 1, 2013) ("[L]ength of the treatment relationship and the frequency of examination are expressly listed among the factors the ALJ must consider in deciding the weight to give the opinions of a medical source." (quotation marks omitted)). These constitute good reasons for the ALJ's rejection of Dr. Solorio's opinion, and where the ALJ provides good reasons, he is not required to expressly address each of the factors set forth in § 404.1527(c). Chapin v. Astrue, No. 11-cv-286-JL, 2012 WL 4499273, at *4 (D.N.H. Sept. 28, 2012).

Thus, the court cannot conclude that the weight accorded to Dr. Solorio's opinion is erroneous for any of the reasons raised by Bourque.[3]

b. Dr. Soucy

Bourque objects to the ALJ's decision to afford the opinion of Dr. Soucy weight in a manner adverse to Bourque. Specifically, the ALJ afforded Dr. Soucy's opinion weight insofar as Dr. Soucy opined that Bourque did not qualify for full disability. In doing so, the ALJ noted that "Dr. Soucy identified activities [that Bourque] was performing while incarcerated that are consistent with [Dr. Soucy's] statement that [Bourque] did not qualify for full disability." Admin. Rec. at 21. Recall that Dr. Soucy stated in his letter that Bourque did work on the night crew which "involved lifting buckets, mopping floors and lifting buffing machines." Id. at 498. Bourque argues that in relying on the fact that Bourque performed this work while incarcerated, the ALJ ignored

_____

[3] Bourque makes two passing assertions that merit only brief comment. First, he asserts, without elaboration, that Dr. Solorio's clinical finding that Bourque had normal strength is not inconsistent with his assessment that Bourque could lift no more than ten pounds. Second, Bourque states that Dr. Kleeman's finding that Bourque is neurologically intact does not conflict with Dr. Solorio's RFC assessment. Without any developed argument or citation to authority, however, the court declines to address these points. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . .").

Bourque's testimony that he only performed such work on a few occasions.

Even accepting Bourque's argument, any error appears to be harmless. Dr. Soucy's opinion was hardly material to the ALJ's analysis. Indeed, the ALJ largely rejected the opinion, accepting it only for the narrow point that Bourque does not qualify for full disability. Other factors, including the opinions of Drs. Fairley and Loeser, as well as the objective medical evidence, factored more significantly into the ALJ's calculus. Absent any argument as to how this alleged error deprived the ALJ's decision of substantial support, the court declines to remand the case on this ground.[4]

---

[4] Bourque raises one additional argument with respect to Dr. Soucy. He argues the ALJ failed to acknowledge that Dr. Soucy is a treating source and failed to address all factors in § 404.1527(c). But even if Dr. Soucy could be considered a treating source, the ALJ provided good reasons for rejecting his RFC assessment of sedentary work. See Chapin, 2012 WL 4499273, at *4. The ALJ noted that the opinion was not based on any examination, but instead was based on Bourque's subjective complaints, and was also inconsistent with the objective medical evidence. Bourque does not challenge these reasons in any detail, beyond stating that the objective medical evidence does not support an RFC for light work "for the same reasons discussed herein with respect to . . . the opinion of Dr. Solorio." Doc. No. 11-1 at 6. Having already rejected those arguments, see note 3, supra, the court need not address them further.

c. Dr. Loeser

Bourque argues that the ALJ erred when he gave the opinion
of Dr. Loeser great weight, because Dr. Loeser only reviewed the
2010 MRI, rather than the 2015 MRI, which showed "more severe
degenerative changes than were identified in 2010." Doc. No.
11-1 at 7. The court finds no error in this respect.

As the Acting Commissioner correctly points out, "the fact
that an opinion was rendered without the benefit of the entire
medical record does not, in and of itself, preclude an ALJ from
giving significant weight to that opinion." Coppola v. Colvin,
No. 12-cv-492-JL, 2014 WL 677138, at *8 (D.N.H. Feb. 21, 2014).
More importantly, the court fails to see the significance of
Bourque's assertion, given that Dr. Loeser did not provide a
functional assessment of Bourque. Rather, the ALJ relied on Dr.
Loeser's report insofar as his examination findings constituted
additional medical evidence to support an RFC of light work.
Dr. Loeser found, among other things, that Bourque had normal
strength and reflexes in his legs, with mildly decreased
sensation in his left leg and a decreased range of motion in the
lumbar spine. Admin. Rec. at 443-44. The ALJ stated that these
examination findings "are generally consistent with those of the
claimant's treating providers" and "are consistent with the
light exertional level." Id. at 21. Bourque does not
articulate how Dr. Loeser's failure to review the 2015 MRI casts

doubt on the physical examination findings, and the court cannot conclude that the ALJ's decision is erroneous on that basis.

    d. Dr. Fairley

    Bourque challenges the ALJ's reliance on the opinion of Dr. Fairley, the non-examining agency consultant, on the ground that Dr. Fairley did not review the 2015 MRI, which showed "more severe degenerative changes."  Doc. no. 11-1 at 7.

    However, as noted above, the fact that an opinion was issued without the entire medical record does not necessarily prevent an ALJ from affording the opinion great weight.  See Coppola, 2014 WL 677138, at *8.  Here, the ALJ relied on Dr. Fairley's opinion because it was consistent with medical evidence pre- and post-dating the 2015 MRI.  In addition, the ALJ cited the evidence that Bourque was able to be weaned off of medication and still maintain normal strength, reflexes, and sensation.  Bourque fails to explain how the 2015 MRI undercuts the ALJ's reasoning, and in the absence of such argument, the court declines to find the ALJ's reliance on Dr. Fairley's opinion erroneous.

II. Bourque's Subjective Complaints and Symptoms

    Bourque raises four arguments to challenge the ALJ's evaluation of Bourque's subjective complaints about his symptoms.  The court addresses each below.

Social Security Ruling ("SSR") 16-3p provides guidance to ALJs when they assess claimants' "symptoms, including pain, under 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)." Coskery v. Berryhill, 892 F.3d 1, 4 (1st Cir. 2018). Under the ruling, "an ALJ determining whether an applicant has a residual functional capacity that precludes a finding of disability must evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." Id. (internal quotation marks omitted). "Moreover, SSR 16-3p provides that, in conducting that inquiry, the ALJ must examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id. (internal quotation marks omitted). But in evaluating the claimant's allegations and complaints, an ALJ may not consider the claimant's "overall character or truthfulness." SSR 16-3p, 2016 WL 1119029, at *10 (Mar. 16, 2016).

First, Bourque argues that the ALJ contravened SSR 16-3p's instruction that an ALJ "not disregard an individual's statements about the intensity, persistence, and limiting

effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." Id. at *5. The ALJ did not violate SSR 16-3p. While the ALJ did rely on the objective medical evidence in rejecting Bourque's allegations, the ALJ also noted other factors, including the medical opinions and Bourque's consistent treatment regimens before and after his alleged onset date.

Second, Bourque claims that the ALJ made an adverse inference from the fact that Bourque has not received extensive treatment, without considering that Bourque "had been without medical insurance or the ability to pay for medical treatment throughout much of his claim period." Doc. No. 11-1 at 10. To be sure, "[w]hen assessing a claimant's failure to pursue recommended treatment, the ALJ must consider 'possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints,' including whether the individual can afford treatment." Genereux v. Berryhill, No. 15-13226-GAO, 2017 WL 1202645, at *7 (D. Mass. Mar. 31, 2017) (quoting SSR 16-3p, 2016 WL 1119029, at *8-9). However, Bourque's argument rests on a misinterpretation of the ALJ's decision.

The ALJ stated in his decision that Bourque's "treatment history is not consistent with the need for further reduction"

of his RFC below the light exertional level.  Admin. Rec. at 20.
The ALJ noted that Bourque's treatment has "remained relatively
stable" both before and after his alleged onset date, consisting
mostly of various medications.  The ALJ then stated that Bourque
"was referred for physical therapy but there is no indication he
was able to attend after his alleged onset date," and he "was
given surgical options but his surgeon also indicated . . .
there was no urgency to having surgery."  Id.  As the court
reads this section of the ALJ's decision, the ALJ is not arguing
that Bourque's failure to attend physical therapy or receive
additional treatment casts doubt on his alleged symptoms.
Rather, the ALJ is noting that the consistent, conservative
courses of treatment prescribed by medical professionals, both
before and after his alleged onset date, does not conflict with
an RFC of light work.  Cf. Slaughter v. Apfel, 205 F.3d 1347,
2000 WL 84407, at *1 (8th Cir. Jan. 14, 2000) (finding that ALJ
properly discredited claimant's subjective complaints where
treating physicians only prescribed conservative course of
treatment consisting of pain medication).

      Third, Bourque argues that the ALJ erroneously concluded
that his activities of daily living are inconsistent with his
claimed symptoms.  Bourque cites Moore v. Colvin, 743 F.3d 1118
(7th Cir. 2014), for the proposition that "the critical
difference between daily living activities and activities of a

full-time job is that in the former the person has more
flexibility in scheduling, can get help from others when needed,
and is not held to a minimum standard of performance." Moore,
743 F.3d at 1126.  The court is not persuaded.  Besides merely
citing Moore, Bourque develops no actual argument as to how the
ALJ's reasoning is erroneous.  Furthermore, Bourque fails to
articulate how this alleged error is anything more than
harmless.  The ALJ relied on other factors in declining to
credit Bourque's subjective complaints.

      Fourth, Bourque asserts that the ALJ erroneously rejected
his testimony that his girlfriend performs most of the household
tasks.  The ALJ was skeptical of Bourque's claim, given that he
also testified that his girlfriend is both physically and
mentally disabled.  Bourque argues that the ALJ should have
"elicit[ed] further testimony from [Bourque] on this topic."
Doc. No. 11-1 at 11.  But Bourque fails to describe how
additional testimony would have bolstered his case.  Absent
that, the court declines to reverse on this basis.  See
Blanchette v. Astrue, No. 08-cv-349-SM, 2009 WL 1652276, at *13
(D.N.H. June 9, 2009) (rejecting claimant's argument that ALJ
failed to inquire into the effects of pain on claimant's
activities of daily living in part because "claimant does not

say what more the ALJ would have learned from the questioning she says should have been conducted").

In short, none of these arguments justifies reversal.

II. Bourque's Intellectual Functioning

Finally, Bourque argues that, despite giving Dr. Jackson's opinion great weight, the ALJ "largely ignores her recommendation" that Bourque "may benefit from intellectual testing to determine his level of cognitive functioning." Doc. no. 11-1 at 8. Although it is not entirely clear what kind of claim of error Bourque is raising—Bourque's brief is devoid of any citation to authority—the court construes his argument to be that the ALJ should have taken up Dr. Jackson's recommendation and ordered intellectual testing. That is, the ALJ erred by failing to further develop the record.

While a claimant bears the burden at steps one through four, the Acting Commissioner retains an obligation "to develop an adequate record from which a reasonable conclusion can be drawn." Jones v. Berryhill, No. 16-11011-DJC, 2017 WL 3726018, at *9 (D. Mass. Aug. 29, 2017). Nevertheless, when a claimant is represented by counsel, the ALJ "should ordinarily be entitled to rely on claimant's counsel to structure and present the claimant's case in a way that claimant's claims are adequately explored." Faria v. Comm'r of Social Sec., 187 F.3d

621, 1998 WL 1085810, at *1 (1st Cir. 1998). Furthermore, "reversal of the ALJ's decision for failure to request additional information is warranted only where the ALJ's failure is unfair or prejudicial to the claimant's case." Gaeta v. Barnhart, No. 06-10500-BPW, 2009 WL 2487862, at *6 n.4 (D. Mass. Aug. 13, 2009). "Prejudice is demonstrated by showing that the additional evidence might have led to a different decision." Keene v. Colvin, No. 14-cv-142-LM, 2014 WL 5456535, at *7 (D.N.H. Oct. 27, 2014).

The ALJ did not commit error in this respect. Because Bourque was represented by counsel, the ALJ was under no heightened duty to develop the record, see Morris v. Astrue, No. 11-cv-248-JL, 2012 WL 4499348, at *9 (D.N.H. Sept. 28, 2012), and the ALJ was entitled to rely on Bourque's counsel to structure the case, see Faria, 1998 WL 1085810, at *1. Here, Bourque did not raise a claim relating to his intellectual functioning, either in his application, in his pre-hearing brief, or at the hearing. The court is therefore disinclined to find fault with the ALJ's conduct. Furthermore, Bourque raises no claim of unfairness, and he makes no showing, let alone a non-speculative one, that additional testing could have led to a different decision. See id. ("Mere conjecture or speculation that additional evidence may be obtained . . . is insufficient

to warrant a remand.").  Therefore, the court declines to reverse the ALJ's decision on this ground.

## CONCLUSION

For the foregoing reasons, Bourque's motion to reverse (doc. no. 11) is denied, and the Acting Commissioner's motion to affirm (doc. no. 13) is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 23, 2018

cc:  Counsel of Record